**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman Basic CHASARE D. JACKSON**
**United States Air Force**

**ACM 38244**

**19 March 2014**

Sentence adjudged 14 September 2012 by GCM convened at Sheppard Air Force Base, Texas. Military Judge: J. Wesley Moore.

Approved Sentence: Dishonorable discharge, confinement for 15 years, forfeiture of all pay and allowances, and a reprimand.

Appellate Counsel for the Appellant: Major Scott W. Medlyn and Major Zaven T. Saroyan.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Daniel J. Breen; Major Rhea A. Lagano; and Gerald R. Bruce, Esquire.

Before

HELGET, WEBER, and PELOQUIN
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

HELGET, Senior Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of one specification of failure to obey a lawful order; two specifications of aggravated sexual assault; one specification of wrongful appropriation; and one specification of unlawful entry, in violation of Articles 92, 120, 121, and 134,

UCMJ, 10 U.S.C. §§ 892, 920, 921, 934.[1] The members sentenced the appellant to a dishonorable discharge, confinement for 15 years, forfeiture of all pay and allowances, and a reprimand. The convening authority approved the adjudged sentence.

Before this Court, the appellant raises four assignments of error: (1) Whether the evidence of aggravated sexual assault of Airman First Class (A1C) EW was factually insufficient because the Government failed to disprove the affirmative defense of mistake of fact beyond a reasonable doubt; (2) Whether the military judge abused his discretion when he admitted testimony under Mil. R. Evid. 413; (3) Whether the members were improperly instructed when the military judge gave the correct verbal instructions but the record of trial contains the wrong written instructions; and (4) Whether Charges I-IV were improperly referred to the court-martial convened by Special Order Number A-13.[2] Finding no error that materially prejudices a substantial right of the appellant, we affirm.

*Background*

In November 2011, the first alleged victim in this case, A1C EW, lived on Sheppard Air Force Base (AFB), Texas, on the second floor of Building 1670. The appellant lived on the first floor of the same building. The dorm rooms were sectioned off into quads, each consisting of a common area and four private rooms.

On Friday, 25 November 2011, the day after Thanksgiving, a party was held on the first floor of Building 1670 near the appellant's quad, attended by approximately 15-20 people. A1C EW was at the party and at some point played a drinking game with the appellant. She also spent a short time alone with him in his room, where he discussed his stab wounds from Iraq and showed her his knife collection. The appellant did not attempt to kiss her, hold her hand, or engage in any sexual activity. A1C EW eventually left the party and went to bed upstairs in her room. A1C EW testified that she had never dated the appellant nor was she romantically attracted to him.

On Saturday, 26 November 2011, at approximately 1815, A1C EW ran into the appellant outside their building after returning from dinner at the chow hall. He asked her if she had any plans for the night. They ended up hanging out in the appellant's room, drinking, watching a movie, and discussing personal issues such as his recent divorce. She was in his room for approximately three and a half hours. According to A1C EW, she drank three to four beers, plus four to five shots of vodka. The appellant had a couple of beers and several shots of vodka. During this time nothing sexual occurred.

---

[1] Consistent with his pleas, the appellant was found not guilty of an additional specification of failure to obey a lawful order, in violation of Article 92, UCMJ, 10 U.S.C. § 892.

[2] This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

The last thing A1C EW remembered doing in the appellant's room was sitting on the floor while drinking shots of vodka. She does not remember leaving the appellant's room and walking upstairs to the quad of A1C KH and A1C AD, located on the second floor above the appellant's room. However, according to A1C KH and A1C AD, A1C EW arrived at their room around 2130. She appeared drunk to them, as she was stumbling and her speech was slurred.

At approximately 2200, A1C KH and A1C AD left to go to Walmart. When they returned 45 minutes later, they found A1C EW sound asleep on A1C AD's bed. They tried to wake her up by screaming at her and shaking her, but without success. They went and found a female friend, A1C PS, who was able to finally rouse A1C EW. A1C PS and A1C AD then escorted A1C EW to her room. Once there, A1C EW did not know where her keys were, so A1C PS contacted the appellant to see if he had them. He indicated he did not have her keys. As a result, to gain entry into the room A1C AD climbed through A1C EW's window and opened her door. A1C PS put A1C EW to bed, locked her window and door, then left.

Later that night, around midnight, A1C EW returned to A1C KH's and A1C AD's room. She remained there until 0200 on 27 November 2011. The witnesses indicated that at this point she was still intoxicated but not as much as earlier.

A1C EW's next recollection was being awakened in her room by the appellant. He was digitally penetrating her vagina with one hand and touching her breasts with his other hand. At first she did not realize who it was, thinking it was someone else. Once she realized who it was, she repeatedly told the appellant to leave. However, the appellant seemed confused, repeating that he had returned her keys and had placed them on her table. The appellant eventually left and A1C EW fell back asleep.

At 0800 the following morning, A1C EW woke up and decided to get some breakfast. However, when she went outside to get into her car, it was gone. She then went and asked the appellant if he knew what had happened to her car, because he had returned her keys the night before. The appellant denied knowing anything about her car, but indicated he would try to find out.

In fact, the appellant had used A1C EW's car without her knowledge. Several hours earlier, at approximately 0300 on 27 November 2011, a Security Forces member on patrol, Airman (Amn) TN, responded to a call to report to the Missile Road gate. Upon arrival, he found the appellant standing next to A1C EW's car. The appellant had run out of gas and needed assistance pushing the vehicle to a secure location. The vehicle had sustained damage consisting of a flat tire, damage to the front and rear bumpers, and some damage to a rear tire. The appellant informed Technical Sergeant (TSgt) DM, who was investigating the incident, that he had driven the vehicle off base to a local bar and then went to a friend's house to play video games. The appellant stated he did not know

how the vehicle was damaged. The appellant told Amn TN that he had earlier "banged" A1C EW and borrowed her car. After his shift ended at 0600, Amn TN returned to his dorm room, which was located in the same quad as the appellant's, and encountered the appellant again. The appellant was drinking and socializing with his roommates, boasting that he had "banged" A1C EW again and returned her car keys to her.

On 3 January 2012, the appellant's first sergeant ordered him to have no contact with A1C EW and to never be on the premises of Building 1670.[3] According to at least two witnesses, they observed the appellant in late January 2012 attending a party that was held in Building 1670.

The second alleged victim is this case was Senior Airman (SrA) HS (formerly SrA HC). She testified that she arrived at Sheppard AFB in August 2008 and lived in Building 1670. She met the appellant through a friend sometime in early 2009. She considered the appellant a friend but never had any romantic interest in him or dated him.

On Friday night, 28 August 2009, the appellant was at the off-base apartment of SrA ZP and invited SrA HS to join him. SrA ZP's wife and a few others were also in attendance. The appellant did not attempt to make any sexual advances towards SrA HS and nothing sexual occurred between them. The following day, 29 August 2009, the appellant again invited SrA HS to join him at SrA ZP's apartment. SrA HS brought a bottle of wine and a bottle of a Margarita mix that contained alcohol. When she arrived, the appellant was already there along with a few others. Ultimately, there were 10-15 people in attendance and there was more of a party atmosphere than the previous night. SrA HS testified that during the party she drank most of the bottle of wine and the bottle of Margarita mix, and additionally added more tequila she acquired at the party to her Margarita mix.

At some point, SrA HS became upset because some of the individuals at the party, including the appellant, told her she had had enough to drink and tried taking the bottle of tequila away from her. SrA HS then left the party, went outside, and got into her truck. The appellant followed and joined her. The appellant comforted her but did not make any sexual advances. Eventually, SrA HS rejoined the party, but due to being intoxicated she decided to lie down and fell asleep on the couch in the living room. She awoke the following morning to the appellant having sexual intercourse with her. She immediately kicked him off of her and asked him what he was doing. The appellant did not respond but looked confused, as if he did not understand why she had reacted that way. SrA HS testified that she still felt intoxicated and did not consent to the sexual intercourse.

---

[3] The appellant previously had been ordered on 26 November 2011 to have no contact with Airman First Class EW, but this order did not specifically state he was prohibited from being on the premises of Building 1670.

*Factual Sufficiency*

The appellant asserts the evidence supporting his conviction for aggravated sexual assault of A1C EW was factually insufficient because the Government failed to disprove beyond a reasonable doubt the affirmative defense of mistake of fact as to consent. We disagree.

Under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we review issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are [ourselves] convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). Review of the evidence is limited to the entire record, which includes only the evidence admitted at trial and exposed to the crucible of cross-examination. Article 66(c), UCMJ; *United States v. Bethea*, 46 C.M.R. 223, 224-25 (C.M.A. 1973).

To establish the offense of aggravated sexual assault under Article 120, UCMJ, the Government was required to prove the following elements, as instructed by the military judge: (1) that at or near Sheppard AFB, Texas, on or about 27 November 2011, the appellant engaged in a sexual act, to wit: vaginal, digital penetration with A1C EW; and (2) that the appellant did so when A1C EW was substantially incapable of declining participation in the sexual act. *Manual for Courts-Martial, United States*, A28-1, ¶ 45.b.(3)(c) (2012 ed.).

In support of his claim of factual insufficiency, the appellant argues that because A1C EW was confused about who was touching her, she must have been awake and processing what was happening to her. Therefore, A1C EW was capable of declining participation and the Government failed to prove beyond a reasonable doubt that a mistake of fact as to consent did not occur.

The military judge provided the members the following instruction concerning mistake of fact:

Mistake of fact as to consent means the [appellant] held, as a result of ignorance or mistake, an incorrect belief that the other person engaging in the sexual conduct consented. The ignorance or mistake must have existed in the mind of the [appellant] and must have been reasonable under all the circumstances. To be reasonable, the ignorance or mistake must have been based on information or lack of it that would indicate to a reasonable person that the other person consented.

Additionally, the ignorance or mistake cannot be based on the negligent failure to discover the true facts. Negligence is the absence of due care. Due care is what a reasonably careful person would do under the same or similar circumstances.

. . . Even if you conclude that the [appellant] was under a mistaken belief that the alleged victim consented to the sexual act, if you are convinced beyond a reasonable doubt that at the time of the charged aggravated sexual assault the [appellant's] mistake was unreasonable, the defense does not exist.

The appellant argues A1C EW was capable of declining participation or that the Government failed to prove beyond a reasonable doubt that a mistake did not occur. Considering the evidence in this case, these arguments are without merit. Contrary to the appellant's contention, the evidence shows A1C EW was substantially incapable of declining participation in the sexual act when the appellant began to digitally penetrate her vagina. A1C EW woke up to the sexual act. Once she was able to comprehend what was happening to her, after an initial period of confusion consistent with someone waking up from a sound sleep, she immediately told the appellant to stop and kicked him out of her room. The appellant's position that the Government failed to prove that a mistake of fact did not occur is likewise unpersuasive. Considering A1C EW's inability to decline participation, that A1C EW and the appellant had not engaged in any previous consensual sexual relations, and that A1C EW had not invited the appellant to her room to engage in sexual activity, the appellant could not have reasonably believed A1C EW was consenting to the sexual act.

Having paid particular attention to the matters raised by the appellant and making allowances for not having personally observed the witnesses, we find the evidence factually sufficient to support his conviction for aggravated sexual assault of A1C EW. We are convinced beyond a reasonable doubt that the appellant is guilty of committing the charged offense and that no mistake of fact occurred.

*Military Rule of Evidence 413*

The appellant contends the military judge abused his discretion when he admitted the testimony of Ms. SG under Mil. R. Evid. 413.

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)) (internal quotation marks omitted).

ACM 38244

Mil. R. Evid 413(a) provides that "[in] a court-martial in which the accused is charged with an offense of sexual assault, evidence of the accused's commission of one or more offenses of sexual assault is admissible and may be considered for its bearing on any matter to which it is relevant." Our superior court has noted that inherent in Mil. R. Evid. 413 is a general presumption in favor of admission. *United States v. Berry*, 61 M.J. 91, 94-95 (C.A.A.F. 2005). There are three threshold requirements for admitting evidence of similar offenses in a sexual assault case under Mil. R. Evid. 413: (1) the accused must be charged with an offense of sexual assault; (2) the proffered evidence must be evidence of the accused's commission of another offense of sexual assault; and (3) the evidence must be relevant under Mil. R. Evid. 401 and 402. *Solomon*, 72 M.J. at 179.

At trial, the defense raised a motion *in limine* to prevent the admission of the testimony of Ms. SG under Mil. R. Evid. 413. The defense argued that the touching of Ms. SG did not constitute a sexual act or contact as defined under Mil. R. Evid. 413. The defense also argued that there was insufficient evidence of attempted sexual contact or an act without Ms. SG's consent.

During her testimony on the motion, Ms. SG testified that she and her husband, who was active duty at the time, were married in March 2011. In June 2011, she and her husband were experiencing marital difficulties, so her husband moved in with the appellant. Ms. SG's husband worked with the appellant in Security Forces, and she also worked for the squadron as a civilian armed security officer.

According to Ms. SG, on 15 June 2011, at approximately 0030, she received a call from the appellant who described to her a dream he had the night before. He said that in the dream he came over to her house, snuck in through her window, and climbed into bed with her. He then said, "You can imagine what happened after that," implying that they engaged in sexual activity. Ms. SG did not take the appellant seriously and replied, "Yeah, whatever," and quickly ended the conversation.

Later that night, after Ms. SG went to bed, she was awoken by what she thought was her husband crawling into bed with her. She thought it was her husband because he had contacted her earlier, indicating he was going to sleep at her house that night. While Ms. SG was lying on her stomach, the person wrapped his arms around her entire body as if trying to become intimate with her. When she rolled over, she realized it was not her husband, but in the darkness she did not know who it was. She grabbed the person's throat and started choking him. She yelled, "What the hell are you doing in my house? Get the hell out of my house!" The person replied, "But you feel so good," and "Just pretend that I'm your husband." After hearing his voice, Ms. SG realized it was the appellant. She then more firmly told him to leave. The appellant left the bedroom and

ACM 38244

started to walk down the hallway. However, he returned to the room, leaned over the bed, and whispered to her that he had forgotten his shoes. He then finally left her house.

Ms. SG testified that during this event she was not certain if the appellant touched her breasts or genitals. As she was lying on her stomach, he did not touch anything on her front side; he only touched her back side. Ms. SG claimed she and the appellant had never engaged in any sexual relations, she was not interested in him romantically, and she had not invited the appellant to her home on 15 June 2011.

In addition to Ms. SG's testimony, the Government submitted Facebook conversations between Ms. SG and the appellant where he discussed his desire to have sex with her.

After hearing all of the evidence and the arguments of counsel, the military judge determined that the Government would be permitted to introduce the testimony of Ms. SG under Mil. R. Evid. 413. In pertinent part, the military judge determined:

> Based on his prior overtures, to include the sexual advances over Facebook and the phone call about the dream, the accused's actions in entering the house uninvited, crawling into her bed and placing his arms around Ms. [SG] were a substantial step and a direct movement toward the commission of an offense of sexual assault. Specifically, there is sufficient evidence to support a finding by a preponderance of the evidence that at the time, the accused intended to fulfill the dream he had earlier related of having sex with a sleeping Ms. [SG] and is therefore guilty of Attempted Aggravated Sexual Assault. Alternatively, although there is no evidence the accused touched Ms. [SG's] "genitalia, anus, groin, breast, inner thigh or buttocks of another person," there is evidence that the accused touched her with intent to gratify his sexual desires, as evidenced by his response, "you feel so good," when Ms. [SG] asked him to stop. Thus, the conduct would not have necessarily amounted to abusive sexual conduct at the time but under Article 120[, UCMJ,] as implemented on 28 June 2012, this conduct would amount to Abusive Sexual Contact. Thus, as of the date of trial, the accused's conduct with Ms. [SG] amounts to sexual contact proscribed by the UCMJ and is an offense of sexual assault under [Mil. R. Evid.] 413.
>
> . . . .
>
> I conclude as a matter of law that conduct constitutes an act of sexual assault for purposes of [Mil. R. Evid] 413 if that act amounted to non-consensual sexual contact proscribed by the UCMJ at the time of trial even if it was arguably not proscribed at the time of the conduct. Inasmuch as

[Mil. R. Evid.] 413 is a rule of liberal admissibility focused on the accused and his proclivities, considerations of notice attendant to the *ex post facto* application of the new UCMJ provision are not implicated. While touching one of the body parts required by the previous UCMJ [article] may be marginally more probative of the accused's propensity than touching any part with an intent to gratify sexual desires, it is only marginally so. Furthermore, the text of [Mil. R. Evid.] 413 supports an intent that it be applied in such a fashion. [Mil. R. Evid.] 413(d) provides an offense of sexual assault is a crime which "…**included** (1) any sexual act or sexual contact, without consent, **proscribed**" by the UCMJ. So, while the past-tense word "included" refers back to the time of the conduct, the word, "proscribed" could be more clear as to its intended temporal application.

The appellant contends the military judge erred in admitting Ms. SG's testimony because the alleged touching of Ms. SG does not constitute a sexual act or contact, as defined in Mil. R. Evid. 413. Further, the appellant claims there was insufficient evidence of an attempted sexual contact or act without Ms. SG's consent.

We find the military judge did not abuse his discretion in admitting the testimony of Ms. SG. The appellant's actions with Ms. SG were highly probative of his propensity to engage in sexual acts or sexual contact with sleeping women. His actions with respect to Ms. SG were strikingly similar to his actions concerning the other two alleged victims. He previously knew all of his alleged victims but had not engaged in any consensual sexual relations with them, all of the alleged victims were unconscious at the time of his assaults, and the misconduct occurred in the early morning hours when no other witnesses were present. The Government presented sufficient evidence showing by a preponderance of the evidence that the appellant committed an attempted aggravated sexual assault on Ms. SG. Although Ms. SG could not state that the appellant had touched either her breasts or genitalia, the evidence shows the appellant had the intent of having sex with the unconscious Ms. SG consistent with fulfilling the dream he had earlier related.[4]

---

[4] We also note the military judge instructed the members they could only consider Ms. SG's testimony if they found by a preponderance of the evidence that a sexual assault occurred. Then the members could only consider the evidence of that offense for its bearing on any matter to which it is relevant only in relation to the offense of aggravated sexual assault as alleged in the Specification of Charge II and the Specification of the Additional Charge. The members could consider the evidence of such other act of sexual assault for its tendency, if any, to show the appellant's propensity to engage in sexual assault, as well as its tendency, if any, to prove a plan or design of the appellant to take advantage of unconscious or sleeping women, or to rebut the mistake of fact as to consent as it applies to the said charges. The military judge further advised the members they could not, however, convict the appellant of the charged offenses merely because they believed he committed this other offense or merely because they believe he has a propensity to engage in sexual assault. He instructed the members they could not use this evidence to overcome a failure of proof in the Government's case. The Government's burden of proof to establish the appellant's guilt beyond a reasonable doubt remained to each and every element of each alleged offense.

In addition to finding that the appellant's actions constituted attempted aggravated sexual assault, the military judge alternatively found the appellant's misconduct amounted to abusive sexual conduct under Article 120, UCMJ, as implemented on 28 June 2012. Recognizing the appellant's conduct would not have amounted to abusive sexual conduct in June 2009, the military judge concluded that conduct constitutes an act of sexual assault for purposes of Mil. R. Evid. 413 if that conduct was proscribed by the UCMJ at the time of trial, even though it was not proscribed by the UCMJ at the time of the conduct. Whether or not the military judge's position is correct, his primary conclusion that the appellant's conduct constituted attempted aggravated sexual assault is supported by the evidence and is not clearly erroneous. As such, we find the military judge did not abuse his discretion in admitting the testimony of Ms. SG.

*Instructions*

The appellant contends the members were not properly instructed when, although they received the correct verbal instructions, the record of trial indicates they received incorrect written instructions from a different case. Alternatively, the appellant claims the omission of the proper instructions from the record of trial is significant, prohibiting this court from affirming the findings and sentence.

"Whether a panel was properly instructed is a question of law reviewed *de novo*." *United States v. Garner*, 71 M.J. 430, 432 (C.A.A.F. 2013) (quoting *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008)). "Whether the record of trial is incomplete" is also a question of law reviewed de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000). The requirement for a complete record of trial to support a sentence including a punitive discharge is jurisdictional and cannot be waived. *Id.* "A substantial omission renders the record of trial incomplete and raises a presumption of prejudice that the Government must rebut." *Id*. at 111.

During the trial, the members received both written and verbal instructions. The written instructions were marked as Appellate Exhibit XXXIX. While neither counsel objected and, presumably the instructions they reviewed were correct, the written instructions contained in the record of trial at Appellate Exhibit XXXIX are from another case with different victims and charges.[5]

In response, the Government submitted the post-trial declaration of the presiding military judge. According to the military judge, the written instructions in the record of trial were never given to the members. He attached a copy of the correct written instructions provided to the members which match the oral instructions provided to the members. The written instructions are marked as Appellate Exhibit XXXIX.

---

[5] The instructions at Appellate exhibit XXXIX are actually marked Appellate Exhibit XXIV. The "XXIV" is crossed out and the number "XXXIX" is written in pencil.

In light of the military judge's declaration and attached written instructions, we find that the members did, in fact, receive the proper written instructions and the record of trial is now complete. The appellant was not prejudiced by the apparent inadvertent inclusion of the wrong instructions in the record of trial.

*Referral of Charges*

The appellant asserts that Charges I-IV were improperly referred to the court-martial convened by Special Order A-13.

Charges I-IV were referred on 1 May 2012 pursuant to Special Order A-7. On 24 May 2012, the additional charge was preferred. On 31 May 2012, the convening authority ordered the withdrawal of the original charges. Pursuant to Air Force Instruction 51-201, *Administration of Military Justice*, ¶ 8.2 (21 December 2007) (Incorporating Change 1, 3 February 2010), Charges I-IV were withdrawn by lining through the original charge sheet and indicating that the charges were withdrawn. The original charges and the additional charge were referred on 25 June 2012 pursuant to Special Order A-13. The appellant did not object to the referral of charges at trial.

Whether charges are properly withdrawn and referred to another court-martial are matters of law reviewed de novo. *United States v. Underwood*, 47 M.J. 805, 809 (A.F. Ct. Crim. App. 1997), *aff'd*, 50 M.J. 271 (C.A.A.F. 1999). A convening authority is permitted to withdraw charges as long as the withdrawal is not being accomplished for an "improper purpose." *See United States v. Easton*, 71 M.J. 168, 171 (C.A.A.F. 2012) (citing Rule for Courts-Martial 604).

We find that Charges I-IV were properly referred by the convening authority. Although we do not find the reasons for withdrawal in the record of trial, there is no evidence that these charges were withdrawn by the convening authority for an improper reason. After withdrawal, Charges I-IV were again referred, along with the additional charge, pursuant to Special Order A-13. Accordingly, this issue is without merit.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000).

ACM 38244

Accordingly, the approved findings and sentence are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court